IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

PATRICK SMITH                                                                    PLAINTIFF

v.                              Case No. 1:22-cv-1064

CITY OF WARREN                                                                   DEFENDANT

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant City of Warren, Arkansas' ("Warren") Motion for Summary Judgment. ECF No. 38. Plaintiff Patrick Smith ("Smith") has responded. ECF No. 48. Warren has replied. ECF No. 50. The Court finds the matter ripe for consideration.

## I. BACKGROUND

Smith began working for Warren in May 2015 in the city's Sanitation Department. Smith possessed a Commercial Driver's License and initially operated a trash pickup truck as a "route supervisor." On January 1, 2018, Smith became Recycling Coordinator, which did not involve the same work responsibilities as his previous position. In March 2022, Rob Johnson ("Johnson"), the recently hired director of the Sanitation Department, requested that Smith return to being a route supervisor to replace a recently terminated driver. The parties dispute whether Johnson presented the change in position to Smith as optional, required, or temporary.

Once Smith began working as a route supervisor again in March 2022, he was paired with Adam Maskell ("Maskell") on his trash pickup routes. Smith, who is Black, alleges that Maskell, who is White, harassed him during their time working together. The alleged harassment consisted of statements made directly to Smith during work and messages Maskell sent over Facebook outside of work hours. Smith contends that this harassment was racially motivated. One particular incident consisted of Smith arriving at Maskell's home to begin their daily route, but with Smith

unaware that Maskell had called in sick for the day. Maskell, appearing drunk, then verbally accosted Smith and threw trash at the truck Smith was driving. Smith states that he informed Johnson of this incident. Afterward, Johnson separated Smith and Maskell from working the same route for a few days before they eventually returned to working routes together. Smith alleges that he reported Maskell's verbal harassment and Facebook messages to Johnson several times, but that Johnson took no further action to alleviate the issue.

On May 17, 2022, Maskell again started sending Smith threatening messages over Facebook. On May 20, 2022, Smith and a co-worker, Moorehead Jordan ("Jordan"), stopped at an Exxon after finishing their trash pickup route. While inside, an altercation arose between Jordan and one of the station employees, Tina Edwards ("Edwards"). Edwards was Maskell's girlfriend or fiancé at the time. Smith was not involved in the altercation. On May 23, 2022, Maskell filed an Employee Complaint against Smith. On May 25, 2022, personnel from the Warren Police Department and Bradley County Sheriff's Department arrested Maskell for multiple crimes related to his discharge of a firearm at or near Smith's home. On May 26, 2022, Warren terminated Maskell's employment and Smith filed an Employee Complaint against Maskell. On June 27, 2022, the 28th State District Court in Warren issued numerous no-contact orders directing Jordan and Smith to refrain from contacting Edwards, and vice-versa. On July 8, 2022, Warren issued an "Employee Disciplinary Action/Warning Report" against Smith in relation to the incident at Exxon. On August 9, 2022, Smith participated in an intake interview with an individual from the Equal Employment Opportunity Commission ("EEOC") regarding alleged racial harassment and discrimination he encountered during his time working with Maskell. On August 10, 2022, Smith submitted a formal Charge of Discrimination ("Charge") to the EEOC regarding the alleged harassment and discrimination.

In October 2022, Smith approached Teresa Sandine ("Sandine"), who was deputy city clerk for Warren at the time, regarding taking medical leave.[1]  Smith first provided Sandine with a note and medical paperwork from APRN Karen Richardson ("Richardson").  Days later, Sandine asked Smith about the purpose of the note and paperwork.  Smith informed Sandine that he wanted to take Family Medical Leave Act ("FMLA") leave.  Sandine then provided Smith with an FMLA certification form for Smith to have his medical provider complete and return.  Richardson filled out the first certificate and Smith returned it to Sandine.  Sandine then verbally informed Smith that there was insufficient information in the first certificate and that he must have his medical provider complete another one.  Smith had Richardson fill out the second certification form and he then returned the second certificate to Sandine.  Sandine again verbally informed Smith that the certificate did not have sufficient information to permit FMLA leave.  Sandine provided Smith with a third certification form.  Smith did not return the third certificate.  Smith submitted his resignation on November 15, 2022.

On October 28, 2022, Smith filed his initial Complaint in this Court.  ECF No. 2.  On August 15, 2023, Smith filed his Amended Complaint, which is the operative complaint in this matter.  ECF No. 21.  Smith brings seven claims against Warren related to his time employed by the city in 2022.  Counts One, Two, and Three assert claims of hostile work environment, discrimination, and retaliation, all pursuant to Title VII of the Civil Rights Act and 42 U.S.C. §§ 1981 and 1983.  Count Four asserts a claim of interference with his rights under the FMLA.  Count Five asserts a claim of constructive discharge.  Count Six asserts a claim of negligent hiring.  Count Seven asserts a claim of violation of Arkansas public policy.  As a result of Warren's alleged actions, Smith states that he "suffered, without limitation, negative effects to his mental and

---

[1] The record does not provide certainty as to the dates relevant to Smith's request for medical leave, but the sequence of events is not in dispute.

physical health, loss of work opportunity, stress, emotional anguish, and other harms." *Id*. at p. 5. Smith seeks injunctive relief, compensatory damages, punitive damages, attorney's fees, and costs.

On October 30, 2024, Warren filed the instant motion seeking summary judgment for all of Smith's claims, along with its brief in support and statement of facts.  ECF Nos. 38, 39, & 40.[2] Warren generally argues that all of Smith's claims fail because he failed to exhaust his administrative remedies for certain claims, the factual record cannot establish any of his claims, and that the city is immune to his negligence claim.  Smith responded in opposition, generally arguing that the factual record is sufficient to establish his claims but conceding that the negligent hiring claim is subject to dismissal.  ECF No. 48.  Warren replied, contending that Smith's response failed to properly raise any disputes of material fact in the record and attempts to improperly add new allegations.  ECF No. 50.

## II. LEGAL STANDARD

"Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Hess v. Union Pac. R.R. Co.*, 898 F.3d 852, 856 (8th Cir. 2018) (quotation omitted); *and see* Fed. R. Civ. P. 56(a). Summary judgment is a "threshold inquiry of . . . whether there is a need for trial—whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they reasonably may be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  A fact is material only when its resolution affects the outcome of the case.  *See id.* at 248.  A dispute is genuine if the evidence is such that it could cause a reasonable fact finder to return a verdict for either party.  *See id.* at 252.

---

[2] Certain exhibits supporting Warren's statement of facts were filed separately under seal.  ECF No. 43.

In deciding a motion for summary judgment, the Court must consider all the evidence and all reasonable inferences that arise from the evidence in the light most favorable to the nonmoving party. *See Nitsche v. CEO of Osage Valley Elec. Co-Op*, 446 F.3d 841, 845 (8th Cir. 2006). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Enter. Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996). The nonmoving party must then demonstrate the existence of specific facts in the record that create a genuine issue for trial. *See Krenik v. Cnty. of LeSueur*, 47 F.3d 953, 957 (8th Cir. 1995). However, a party opposing a properly supported summary judgment motion "may not rest upon mere allegations or denials . . . but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. DISCUSSION

**A. Exhaustion of Administrative Remedies for Title VII Claims**

Warren argues that some of Smith's asserted claims cannot be brought under Title VII because he did not exhaust his administrative remedies with the EEOC. ECF No. 39, p. 3-7. Warren notes that any employment discrimination claims pursuant to Title VII must first be raised with the EEOC. Warren then contends that Smith's EEOC Charge (ECF No. 40-22) is limited to alleging discrimination and retaliation related to his July 2022 reprimand. Thus, any additional claims are beyond the scope of the EEOC Charge, have not been exhausted with the EEOC, and cannot be brought under Title VII. In response, Plaintiff tersely asserts that "the race-based claims in the operative complaint are fairly raised by the Charge of Discrimination." ECF No. 48, p. 19.

"Before a plaintiff can bring a lawsuit alleging unlawful discrimination under Title VII, he must file a timely charge with the EEOC or a state or local agency with the authority to grant or seek relief." *Jones v. City of St. Louis, Mo.*, 825 F.3d 476, 482 (8th Cir. 2016) (citing 42 U.S.C §

2000e-5(e)(1)).  Each "practice" challenged in a charge must be a discreet act that "constitutes a separate actionable 'unlawful employment practice.'"  *Id.* (internal quotation omitted).  Title VII administrative remedies are exhausted for incidents "like or reasonably related to the allegations" within a charge, and the scope of a civil action brough pursuant to Title VII is "limited to the claims properly brought" within the administrative charge.  *Paskert v. Kemna-ASA Auto Plaza, Inc.*, 950 F.3d 535, 539 (8th Cir. 2020) (quotation omitted).  Though a court should "construe administrative charges liberally," it will not "invent, *ex nihilo*, a claim that was not made before the relevant agency."  *Weatherly v. Ford Motor Co.*, 994 F.3d 940, 944 (8th Cir. 2021) (italics in original).  "The key is that the scope of a judicial complaint can be no broader than the scope of the EEOC investigation that 'could reasonably be expected to grow out of the charge' in the EEOC complaint."  *Id.* (internal quotation omitted).

Interpreting his Charge liberally, the Court finds that Smith only asserted two unlawful employment practices that can now be brought in this Court pursuant to Title VII: hostile work environment and retaliation.  The Charge reads:

> I was hired on or about May 15, 2015, with my most recent position being Trash Truck Driver. On or about March 21, 2022, I reported a coworker for harassment and being intoxicated to my supervisor. On or about May 2022, I reported a coworker for harassment again to my supervisor. On or about May 25, 2022, I was disciplined. I was told to pick someone else up for the day and that he doesn't get into personal shit. I was told if I kept up, I was going to get fired. I was told notified on July 8, 2022, that I was written up for inappropriate conduct on May 25, 2022. I believe I was harassed because of my race, African American, and disciplined in retaliation for my complaints in violation of Title VII of the Civil Rights Act of 1964, as amended.

ECF No. 40-22.  The only distinct claims that can be construed within or "expected to grow out of" the Charge are stated in the last line: race based "harassment" by a co-worker and "retaliation" for reporting that harassment.  Though Smith asserts a "race discrimination" claim under Title VII in Count Two of the Amended Complaint, that type of claim is distinct from a hostile work

environment claim and a retaliation claim. *See Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1018-19 (8th Cir. 2011) (describing the distinction between a discrimination claim and a hostile work environment claim); *Paskert*, 950 F.3d at 538-40 (describing the distinction between a discrimination claim, a hostile work environment claim, and a retaliation claim). A discrimination claim requires showing that "(1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination." *Pye*, 641 F.3d at 1019. The allegations in the Charge do not permit finding that such a claim was brought to the EEOC.[3] Therefore, the only two claims properly before the Court pursuant to Title VII are Smith's hostile work environment claim based upon Maskell's actions and a retaliation claim based upon his complaints about Maskell that allegedly resulted in disciplinary action.

### B. Claims Pursuant to 42 U.S.C. §§ 1981 and 1983

Smith asserts that his claims for hostile work environment in Count One, discrimination in Count Two, and retaliation in Count Three are also pursuant to 42 U.S.C. § 1981 and § 1983. Section § 1983 states that "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law[.]" 42 U.S.C. § 1983. Section 1983 does not create any substantive rights; it simply creates a cause of action for asserting a violation of a Constitutional right or civil right guaranteed by federal law. *See Miener v. State of Mo.*, 673 F.2d 969, 976 n.6 (8th Cir. 1982) (citation omitted). Section 1981 states that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and

---

[3] Because the Amended Complaint only asserts that Counts One, Two, and Three are brought pursuant to Title VII, the Court will not construe Count Five's constructive discharge claim as one brought under Title VII.

Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens[.]" 42 U.S.C. § 1981(a). Claims for racial discrimination, hostile work environment, and retaliation in employment are recognized causes of action that may be brought pursuant to § 1981. *See Onyiah v. St. Could State Univ.*, 5 F.4th 926, 928 (8th Cir. 2021) (noting that discrimination and retaliation claims may be brought under § 1981); *Clay v. Credit Bureau Enter., Inc.*, 754 F.3d 535, 537-39 (8th Cir. 2014) (noting that a hostile work environment claim may be brought pursuant to § 1981).

A § 1981 claim against a state actor may only be brought pursuant to § 1983. *See Onyia*, 5 F.4th at 929 (citations omitted). "A municipality cannot be held liable under § 1983 solely because it employs a tortfeasor[.]" *Bolderson v. City of Wentzville, Mo.*, 840 F.3d 982, 985 (8th Cir. 2016). Municipal liability under § 1983 "arises if injury results from 'action pursuant to official municipal policy of some nature.'" *McGuatha v. Jackson Cnty., Mo., Collections Dept.*, 36 F.3d 53, 55-56 (8th Cir. 1994) (quotation omitted); *and see Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735-36 (1989) (holding that to prevail on a § 1981 claim against a state municipal entity requires showing that the violation was "caused by a custom or policy" of the entity). Municipal liability under § 1983 may also arise from a pervasive and unofficial "custom" that has the force of law. *Bolderson*, 840 F.3d at 986. Such a custom is shown by demonstrating a "continuing, widespread, and persistent pattern" of discrimination. *Id.* The City of Warren is the lone Defendant in this action. Thus, to prevail on his § 1983 claims to enforce his rights under § 1981, Smith must show that the alleged deprivations of his rights were the result of an official policy or unofficial custom of Warren. *See Jett*, 491 U.S. at 735-36.

Smith's Amended Complaint makes no discernable allegations regarding policies or customs in either the broad factual background section or within the specific allegations underlying Counts One, Two, or Three.  ECF No. 21, p. 1-4.  More importantly, Smith has not presented evidence that could establish that these claims arise from an official policy or unofficial custom of Warren.  In support of his discrimination claim in Count Two, Smith offers the passing and conclusory statement that "the facts provide ample evidence of a racial motivation for the demotion (and, relatedly, that this action was part of a policy, pattern, or custom)."  ECF No. 48, p. 5.  Smith follows that statement with no reference to an official policy of Warren that caused the alleged discrimination.  Smith also cites evidence that is plainly insufficient to establish a "widespread, persistent pattern" of discrimination.  Smith relies entirely on evidence that the individual who was hired to replace him as Recycling Coordinator was a less qualified White man, that Maskell was White, and that the racial makeup of the Sanitation Department changed over time from eight Black workers into a mixture of three White workers and five Black workers after Johnson was hired.  *Id*. at p. 5-6.  However, there is no evidence in the record that the change in racial makeup in the Sanitation Department is itself the result of discrimination and thus cannot be considered part of a "pattern" of discrimination.  *See Bolderson*, 840 F.3d at 986 (noting that evidence revealing only "unsubstantiated suspicions" of a plaintiff is insufficient to establish an unofficial custom).  Further, Smith's change in position and pairing with Maskell, even if the result of discrimination, cannot be viewed as establishing pervasive and widespread discrimination by any of Warren's employees.

Smith's response makes no direct argument concerning Warren's policies or customs when discussing the hostile work environment claim in Count One or the retaliation claim in Count Three.  ECF No. 48, p. 15-17.  Moreover, the Court sees no evidence in the record demonstrating

that the alleged hostile work environment and retaliation was the result of an official policy or unofficial custom.  The only reference Smith makes to a policy in his response comes from his argument that former Warren Mayor Denisa Pennington could not concretely identify which city conduct policy Smith violated that would justify his May 2022 disciplinary reprimand.  ECF No. 48-1, p. 5 (citing ECF No. 48-6, pp. 19, 22-26).  That is insufficient to create a genuine question of fact because a failure to adhere to an official policy is inadequate on its own to establish § 1983 liability.  *See Gardner v. Howard*, 109 F.3d 427, 430 (8th Cir. 1997).

Because the record cannot establish that the claims underlying Counts One, Two, and Three arise from an official policy or unofficial custom of Warren, Smith's § 1983 claims fail as a matter of law and Warren must be granted summary judgment on these claims.

### C. Title VII Claims

The Court will now address the two Title VII claims that were administratively exhausted and are properly raised in this action.

#### 1. Hostile Work Environment

Smith states his hostile work environmental claim as this: "Mr. Smith faced unwelcome harassment from a white coworker, resulting in an effect on a term, condition, or privilege of employment.  Defendant knew about the harassment and failed to take proper remedial action. The harassment he suffered created an environment that was both objectively and subjectively abusive."  ECF No. 21, p. 3.

Warren argues that the factual record cannot establish Smith's claim for hostile work environment.  ECF No. 39, p. 17-20.  Warren first contends that there is no evidence in the record, apart from Smith's speculation, that indicates any of the harassment from Maskell was motivated by Smith's race.  Warren also notes that very little of the alleged harassment occurred during work

because Maskell's threatening and harassing Facebook messages were sent outside of work hours. Warren then contends that the few concrete examples of inappropriate or harassing behavior Maskell engaged in during work, even if motivated by Smith's race, cannot reach the demanding standard for a hostile work environment. Warren also emphasizes that Smith testified in his deposition that he and Maskell had no problems working together from approximately late March or early April 2022 until the middle of May 2022, which represents the vast majority of the time they worked together.

In response, Smith states:

Mr. Maskell, who is white, made numerous threats against Mr. Smith, who is black. Moreover, his comments and tone suggested to Mr. Smith that Maskell's issues with him related to his race and how he thought a black man should act, what he should or should not have, etc. Moreover, the only conflicts that he was aware of Maskell having were with him and another black employee. Accordingly, he has set forth a claim of hostile work environment.

ECF No. 48, p. 17. Citing his own declaration, Smith's response to Warren's Statement of Facts disputes that he had no issues with Maskell from shortly after the trash throwing incident until the middle of May 2022. ECF No. 48-1, p. 2 (citing ECF No. 48-2). In reply, Warren contends that Smith's declaration is both vague and inconsistent with his own deposition and EEOC intake interview statements regarding Maskell. ECF No. 50, p. 3.

A claim of hostile work environment based on race requires showing that: 1) the plaintiff "is a member of a protected group;" 2) they were "subject to unwelcome race-based harassment;" 3) "the harassment was because of membership in the protected group; and 4) the harassment affected a term, condition, or privilege of employment." *Clay*, 754 F.3d at 540 (quotation omitted). The fourth element is a demanding standard:

In order for harassment to have affected a term, condition, or privilege of employment, the harassment must have been "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working

environment."  Consideration of this element of a hostile work environment claim "includes both objective and subjective components: an environment that a reasonable person would find hostile and one that the victim actually perceived as abusive."  "To decide whether a work environment is objectively offensive, . . . we examine all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance."  "A hostile work environment exists when the workplace is dominated by racial slurs, but not when the offensive conduct consists of offhand comments and isolated incidents."

*Id*. (internal citations omitted).  The alleged conduct "must be extreme in nature and not merely rude or unpleasant" because "'Title VII does not prohibit all verbal or physical harassment' and is not a 'general civility code for the American workplace.'"  *Nitsche v. CEO of Osage Valley Elec. Co-op.*, 446 F.3d 841, 846 (8th Cir. 2006) (quotation omitted).

The Court finds that Smith has failed to establish his hostile work environment claim.  Most significantly, the record is inadequate to show that any harassment Smith endured from Maskell was severe enough to alter the conditions of his employment.  Though Smith asserts that he was subjected to continuous harassment, the only concrete example of harassment that occurred at work is the incident in which Maskell threw trash at Smith's truck and threatened him.  Neither Smith's deposition (ECF No. 40-1)[4] nor declaration (ECF No. 48-1) provides details on other instances of harassment that occurred at work.  The declaration simply states "[Maskell's] insults, often accompanied by threats, seemed based on stereotypes about what kind of person I should be due to my race."  ECF No. 48-1, p. 3.  The most specific comment Smith provided in his deposition is Maskell's "references that he was making about I couldn't fight and that I drove a Maserati."

---

[4] The Court notes that only Warren attached Smith's deposition as an exhibit to its filings, even though it is not the full transcript.  ECF No. 40-1.

ECF No. 40-1, p. 34.[5]  As to the Facebook messages (ECF No. 40-11),[6] Smith testified that he and Maskell worked without issue for most of their time together and he does not contend that the messages impacted his work environment.  ECF No. 40-1, p. 23-24.  The Court will not view the messages as contributing to a hostile work environment if there is no evidence that they worsened working conditions.  *See Lapka v. Cheroff*, 517 F.3d 974, 983 (7th Cir. 2008) (noting that harassment outside of work hours can be actionable if it has "consequences in the workplace.").  These facts cannot demonstrate that Smith was subject to a pervasively oppressive and abusive workplace "dominated by racial slurs" that is necessary to satisfy the fourth element of his hostile work environment claim.  *Clay*, 754 F.3d at 540.

Further, the factual record is inadequate to establish that any harassment was based upon Smith's race.  Smith has not presented anything demonstrating that Maskell's actions were motivated by race other than assumption.  Smith's declaration does not detail any explicitly racial statements made by Maskell or anything clearly suggestive of racial motivation.  Smith merely opines that "I believe that the harassment I suffered at Maskell's hands was racial[]" and "[Maskell's] insults, often accompanied by threats, seemed based on stereotypes about what kind of person I should be due to my race."  ECF No. 48-1, p. 3.  As noted above, the only specific comments that Smith referenced in his deposition that were racially motivated were Maskell's "references that he was making about I couldn't fight and that I drove a Maserati."  ECF No. 40-1, p. 34.  The Court finds this insufficient to create a genuine question of fact as to whether Maskell's actions were motivated by Smith's race.

---

[5] The Court notes that it is citing to the ECF page number when referencing depositions, and not the page number listed on the document.

[6] The messages in this exhibit are the only ones entered into the record and appear to be limited to messages sent on March 19, 2022.

Smith's failure to establish multiple elements of his hostile work environment claim entitles Warren to summary judgment on this claim.

### 2. Retaliation Claim

Smith states his retaliation claim with: "Mr. Smith engaged in protected activity, was subject to numerous adverse employment actions, and a causal connection exists between that activity and the adverse actions." ECF No. 21, p. 3-4. As noted above, the Court construes this claim as rooted in the EEOC Charge allegations that he was reprimanded for raising complaints about Maskell's behavior.

Warren argues that the record cannot establish Smith's retaliation claim. ECF No. 39, pp. 12, 20-24. Warren first contends that there is no evidence that Smith engaged in protected activity because his complaints about Maskell were not addressing any unlawful or discriminatory acts. Warren also contends that Smith did not suffer an adverse employment action because his written warning did not involve any substantive discipline or alter any aspect of his employment, such as his pay or job duties. Warren then disputes that there is any evidence of a causal connection between the complaints Smith made to Johnson in March 2022 and the warning issued in July 2022. Lastly, Warren contends that the evidence demonstrates that the Exxon incident was a legitimate and non-discriminatory reason for issuing the warning to Smith, and that there is no evidence that this explanation is pretextual.

In response, Smith emphasizes that Maskell was never issued any warnings about his behavior even though it far exceeded any of Smith's actions in terms of reprehensibility. ECF No. 48, p. 15-17. Smith contends that the disparity between his ignored complaints about Maskell's actions and the warning he received for the Exxon incident for which he was simply a bystander demonstrates that he was punished for voicing concerns about Maskell. Smith also notes that there

is not a city policy that he appears to have violated which would justify the warning regarding the Exxon incident.

Smith does not argue that there is direct evidence that his reprimand was retaliation for raising complaints about Maskell, and the Court sees no such evidence in the record. In the absence of direct evidence, a court evaluates a Title VII claim of retaliation using the *McDonnel Douglas* burden shifting framework that first requires a plaintiff to establish a prima facie case. *See DePriest v. Milligan*, 823 F.3d 1179, 1187 (8th Cir. 2016); *and see Blackwell v. Alliant Techsystems, Inc.*, 822 F.3d 431, 436 (8th Cir. 2016). Establishing a prima facie case for retaliation requires showing that the plaintiff: 1) engaged in statutorily protected conduct; 2) suffered an adverse employment action; and 3) there is a causal connection between the two. *See DePriest*, 823 F.3d at 1187. If a plaintiff makes the prima facie showing, the employer must then present evidence of a legitimate and non-discriminatory reason for the adverse employment action. *See id*. If an employer gives such evidence, then the plaintiff must then provide evidence that the employer's proffered reason was pretextual. *See id*.

The Court finds that Smith cannot establish a prima facie case of retaliation because he cannot show that he suffered an adverse employment action. Smith's reliance on the written disciplinary warning (ECF No. 43-8) cannot sustain his claim. "An adverse employment action is a disadvantageous change to the compensation, terms, conditions, or privileges of employment." *Cole v. Group Health Plan, Inc.*, 105 F.4th 1110, 1114 (8th Cir. 2024). "A reprimand is an adverse employment action only when the employer uses it as a basis for changing the terms or conditions of the employee's job for the worse. When a reprimand does not affect the terms and conditions of a plaintiff's employment, [a plaintiff] 'cannot make out a prima facie case' of retaliation." *Wagner v. Campbell*, 779 F.3d 761, 767 (8th Cir. 2015) (internal citations and quotations omitted);

*and see Barnett v. Athens Reg'l. Med. Center, Inc.*, 550 Fed. App'x 711, 713 (11th Cir. 2013) (finding that the plaintiff failed to establish a prima facie case of retaliation because "[t]he written reprimands and negative performance review had no effect on [plaintiff's] employment."); *see also Skylarsky v. AMB Janitorial Servs.-N. Central, Inc.*, 494 Fed. App'x. 619, 622 (7th Cir. 2012) (noting that a reprimand which does not "materially alter the terms or conditions of employment" is not an adverse employment action). There is no evidence in the record suggesting that Smith's position, pay, hours, or job duties changed as a result of the written warning, or did so any time after the warning was issued. Accordingly, Smith's Title VII retaliation claim fails and Warren must be granted summary judgment on this claim.

### D. Constructive Discharge Claim

Smith states his constructive discharge claim by alleging "[d]ue to the acts and omissions of Defendant, Mr. Smith was forced to leave his employment." ECF No. 21, p. 4. Smith does not state what law or statute this claim proceeds under. Smith cites federal law when responding to the instant motion, so the Court will not interpret the claim as one under State law. As noted above, this claim was not alleged in Smith's EEOC charge and thus cannot be made under Title VII. Therefore, the Court will interpret Smith's constructive discharge claim as one made pursuant to § 1981. *See Lennox v. Mid-America Car, Inc.*, 126 Fed. App'x 757, 757 (8th Cir. 2005) (noting that a constructive discharge claim may be brought pursuant to § 1981). "Constructive discharge occurs when an employer deliberately renders the employee's working conditions intolerable, thereby forcing [them] to quit." *Sellars v. CRST Expedited, Inc.*, 13 F.4th 681, 700 (8th Cir. 2021) (quotation omitted). An employee does not need to show that the employer subjectively intended for them to quit, only that the intolerable conditions are attributable to the employer through its creation or knowing tolerance of the conditions. *See id.* at 700-01.

Warren argues that the record cannot establish that Smith's working conditions were so intolerable that he was forced to quit. ECF No. 39, p. 13-15. Warren reiterates that Maskell's behavior during work was not significant enough to create objectively intolerable conditions and emphasizes that Smith did not resign until several months after Maskell was fired. In response, Smith argues that his demotion, his pairing with Maskell, the unjustified written reprimand, and the hurdles preventing him from taking FMLA leave all created an environment that was attributable to Warren and forced him to quit. ECF No. 48, p. 18.

The Court finds that Smith has failed to establish a constructive discharge claim. First, as previously discussed, a § 1981 claim against a municipality must be made pursuant to § 1983 and must show that the alleged harm arises from an official policy or unofficial custom of that municipality. *See Jett*, 491 U.S. at 735-36. Smith has not presented any discernable argument that the allegedly intolerable conditions were the result of an official policy or an unofficial custom, and the record cannot demonstrate that there was any such policy or custom. Additionally, for the same reasons noted when discussing Smith's Title VII hostile work environment claim, the record cannot support a finding that Smith's working conditions were so intolerable that he was forced to resign. Accordingly, Warren must be granted summary judgment on this claim.

### E. Negligent Hiring/Retention Claim

Smith alleges that Warren was negligent in its hiring and retention of Maskell despite his history and exhibited behavior during his employment for the city.[7] ECF No. 21, p. 4. Warren argues that this claim must fail because it is immune from tort under Arkansas law, specifically

---

[7] Smith's negligent hiring claim and public policy claim are pursuant to Arkansas law. The Court finds that it has supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367 because they are so related to Smith's Title VII and § 1981 claims that they "form part of the same case or controversy[.]" 28 U.S.C. § 1367(a).

Arkansas Code § 21-9-301. ECF No. 39, p. 30-31. Smith concedes that "his negligence claims are subject to dismissal." ECF No. 48, p. 19.

Warren is clearly immune from Smith's negligence claim under Arkansas law. Arkansas Code § 21-9-301 states:

> (a) It is declared to be the public policy of the State of Arkansas that all counties, municipal corporations, school districts, public charter schools, special improvement districts, law enforcement agencies for and certified law enforcement officers employed by a public or private institution of higher education, and all other political subdivisions of the state and any of their boards, commissions, agencies, authorities, or other governing bodies shall be immune from liability and from suit for damages except to the extent that they may be covered by liability insurance.
>
> (b) No tort action shall lie against any such political subdivision because of the acts of its agents and employees.

Ark. Code. Ann. § 21-9-301. It is undisputed that Warren does not carry liability insurance for negligence claims, creating immunity under § 21-9-301(a). ECF No. 40, ¶ 79; ECF No. 48-1, ¶ 28. Further, no tort claims may be brought against Warren for the actions of its employees or agents under § 21-9-301(b). Smith does not contest that Warren is immune from his negligence claim. Accordingly, Smith's negligent hiring and retention claim must be dismissed with prejudice.

### F. Violation of Public Policy

Smith alleges his public policy claim by stating "Defendant's mistreatment and constructive discharge was a violation of the public policy of Arkansas." ECF No. 21, p. 4. Warren argues that this claim fails because Smith's constructive discharge claim fails, eliminating any public policy consideration that could prevent termination of an at-will employee. ECF No. 39, p. 30-31. In response, Smith references his complaints about Maskell before asserting that "Arkansas provides protection for whistleblowers" and stating that Arkansas Code § 16-118-107

provides a civil cause of action for victims of a crime.  ECF No. 48, p. 17-19.  In reply, Warren contends that Smith is functionally attempting to amend his complaint by referencing Arkansas' whistleblower law and the civil action for crime victims.  ECF No. 50, p. 8.  Warren asserts that Smith's Amended Complaint gave it no notice that this was the nature of his public policy claim and that such an attempt to amend a claim in response to a summary judgment motion is impermissible.

Under Arkansas law, "when an employment contract is silent as to its duration, either party may terminate the relationship at will and without cause." *Jenkins v. Mercy Hosp. Rogers*, 2021 Ark. 211, at 7, 633 S.W.3d 758.  Warren has provided its personnel policy manual, which states that "[t]he City of Warren is an at-will employer."  ECF No. 40-30, p. 11.  Smith does not dispute that he was an at-will employee.  There is "a limited exception to the at-will doctrine when an employee is terminated in violation of a well-established public policy of the state." *Jenkins*, 2021 Ark. 211, at 9.  For a policy to be well-established, it must be outlined in an Arkansas statute. *See id*.

The Court finds that Smith has failed to show that Warren violated any Arkansas public policy.  Smith's public policy claim does not cite any Arkansas statute and instead relies entirely on his alleged "mistreatment" and "constructive discharge" by Warren.  Assuming that Smith is referring to his hostile work environment and constructive discharge allegations more broadly and that there is an Arkansas statute directly addressing such circumstances, these terse allegations do not suffice because the Court determined above that Smith has failed to establish either of those claims.  Further, Warren's objection to Smith's new arguments regarding Arkansas' whistleblower statute and civil action for crime victims is well founded.  A pleading must "contain a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).

This requirement is meant to give "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Amended Complaint does not give Warren "fair notice" that Smith was alleging that it violated any whistleblower statute and the Court will not examine Smith's claim as if he did so. Furthermore, Smith does not attempt to provide any elaboration or evidentiary support for his shallow assertion that Warren may have violated a whistleblower statute. As to Arkansas Code § 16-118-107, that statue provides an independent cause of action and does not set out any statutory policy that Warren could violate by firing Smith.[8] *See* Ark. Code Ann. § 16-118-107; *and see Jenkins*, 2021 Ark. 211, at 9 (noting that a public policy claim requires that a statute be violated). Accordingly, Warren is entitled to summary judgment on this claim.

### G. FMLA Claim

The relevant factual allegations for Smith's FMLA claim assert that he began experiencing "health problems" after the issues with Maskell. ECF No. 21, p. 2-3. Smith then requested FMLA leave and "[d]espite providing the documentation and information he was made to believe was sufficient to facilitate such leave, he was met with delay and told that he had not done what was necessary, while not actually being told what he needed to do." In stating his claim, Smith asserts

---

[8] That statute is entitled "Civil action by crime victim" and reads:

> (a)(1) Any person injured or damaged by reason of conduct of another person that would constitute a felony under Arkansas law may file a civil action to recover damages based on the conduct.
> (2) The burden of proof for showing conduct that constituted a felony shall be a preponderance of the evidence.
> (3) If the person who is injured or damaged prevails, he or she shall be entitled to recover costs and attorney's fees.
> (b) The action may be maintained by the person who was injured or damaged or, after the person's death, the executor, administrator, or representative of his or her estate.
> (c) The remedy provided in this section shall be in addition to any other remedies in law or equity.
> (d) This section does not apply to offenses under § 5-28-101 et seq. or the Medicaid Fraud Act, § 5-55-101 et seq.

Ark. Code Ann. § 16-118-107.

that he "was an employee eligible for and entitled to FMLA leave during the relevant time period. He gave notice to the defendant that he intended to take FMLA leave. He was denied that to which he was entitled under the FMLA." *Id*. at p. 4.

Warren argues that Smith has failed to establish that it interfered with his rights under the FMLA. ECF No. 39, p. 24-29. Though conceding that it is an employer and that Smith is a covered employee under the FMLA, Warren contends that Smith cannot show that he was entitled to take FMLA leave. Warren highlights that none of the paperwork Smith gave to Sandine, including two FMLA certificates provided to Smith for a healthcare provider to complete, specified what medical condition Smith was suffering from that qualified him for leave or how much leave any condition would require. Warren then focuses on Smith's deposition, asserting that it demonstrates that Smith could not clearly or consistently articulate what medical condition qualified him for leave. Warren then contends that it did not interfere with any rights Smith had under the FMLA because it had its own right to inquire further into Smith's request and require Smith to complete the provided FMLA certificates. Warren reiterates that the FMLA certificates Smith returned were not correctly completed and did not provide Warren with the requisite information to determine if Smith qualified for FMLA leave.

In response, Smith disputes that he has failed to demonstrate that he was qualified for FMLA leave and that Warren interfered with his right to take FMLA leave. ECF No. 48, p. 6-15. Smith first asserts that the record provides clear evidence that he gave Warren notice that he sought FMLA leave. Smith highlights the first medical paperwork he gave to Sandine, his later direct statements made to Sandine, and the two FMLA certificates he returned as demonstrating that Warren was fully aware of his desire to take leave. Smith then highlights that neither Sandine nor any other Warren employee provided him with written instructions as to why the FMLA

21

certificates he returned were inadequate and what he must do to correct any shortcomings in the certificates. Smith notes that failure to provide such written instruction explicitly violates FMLA regulations. Smith also contends that the evidence is sufficient to show that he had a serious health condition entitling him to FMLA leave. Smith asserts that the second FMLA certificate he returned indicates that he had thyroid issues, and that he was suffering from significant mental health issues because of his experiences with Maskell which culminated in Maskell discharging a firearm at his home.

Under the FMLA, a covered employee is generally entitled to a total of 12 weeks of leave during any 12-month period for a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). "Serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves" . . . "inpatient care in a hospital, hospice, or residential medical care facility" or "continuing treatment by a health care provider." 29 U.S.C. § 2611(11)(A)-(B). "Inpatient care means an overnight stay in a hospital, hospice, or residential medical care facility, including any period of incapacity as defined in § 825.113(b), or any subsequent treatment in connection with such inpatient care." 29 C.F.R. § 825.114.

Title 29 § 825.115 provides the expansive[9] definition of "continuing treatment" for purposes of the FMLA:

> A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:
>
> (a) Incapacity and treatment. A period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition . . .
>
> (b) Pregnancy or prenatal care. Any period of incapacity due to pregnancy, or for prenatal care . . .

---

[9] The Court provides an abridged version of § 825.115 and will reference the omitted segments if necessary.

(c) Chronic conditions. Any period of incapacity or treatment for such incapacity due to a chronic serious health condition . . .

(d) Permanent or long-term conditions. A period of incapacity which is permanent or long-term due to a condition for which treatment may not be effective. The employee or family member must be under the continuing supervision of, but need not be receiving active treatment by, a health care provider . . .

(e) Conditions requiring multiple treatments. Any period of absence to receive multiple treatments (including any period of recovery therefrom) by a health care provider or by a provider of health care services under orders of, or on referral by, a health care provider . . .

(f) Absences attributable to incapacity under paragraph (b) or (c) of this section qualify for FMLA leave even though the employee or the covered family member does not receive treatment from a health care provider during the absence, and even if the absence does not last more than three consecutive, full calendar days . . .

29 C.F.R. § 825.115. "The term incapacity means inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom." 29 C.F.R. § 825.113(b).

"The FMLA recognizes two types of claims by employees: interference and retaliation." *Bradley v. Little Rock Wastewater Util.*, 517 Fed. App'x 530, 532 (8th Cir. 2013) (quotation omitted); *and see* 29 U.S.C. § 2615(a)(1) ("It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA). An interference claim is also labeled as an "entitlement" claim because "an employee claims the denial of a benefit to which he is entitled under [FMLA]." *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005 (8th Cir. 2012). Interference "would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave. It would also include manipulation by a covered employer to avoid responsibilities under FMLA[.]" 29 C.F.R. § 825.220.

To succeed in an interference claim, a plaintiff must show that they were eligible for FMLA leave, that their employer was on notice of their need for FMLA leave, and that their employer denied them benefits to which there were entitled under the FMLA.  *See Hasenwinkel v. Mosaic*, 809 F.3d 427, 432 (8th Cir. 2015).  "The initial burden of proof in an FMLA interference case is on the employee to 'show only that he or she was entitled to the benefit denied.'"  *Ballato v. Comcast Corp.*, 676 F.3d 768, 772 (8th Cir. 2012) (internal quotation omitted); *and see Johnson v. Wheeling Mach. Prod.*, 779 F.3d 514, 519 (8th Cir. 2015) (noting that a plaintiff has the initial burden of establishing that he "had a serious health condition entitling him to FMLA leave.").  In an FMLA action, "[t]he damages recoverable are strictly defined and measured by actual monetary losses." *Rodgers v. City of Des Moines*, 435 F.3d 904, 908-09 (8th Cir. 2006) (quoting *Nev. Dept. of Hum. Res. v. Hibbs*, 538 U.S. 721, 739-40 (2003)); *and see* 29 U.S.C. § 2617(a)(1)(A) (detailing how FMLA damages are measured, such as by the value of "any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation[.]").

The Court finds that Smith has failed to establish his FMLA interference claim.  Warren does not dispute that Smith provided notice that he sought FMLA leave.  However, the record lacks sufficient evidence to demonstrate that Smith had a serious health condition qualifying him for FMLA leave.  Stated bluntly, in a trial on this claim, the Court is uncertain what condition Smith would attempt to demonstrate that he had.  There is no clear indication of what distinct serious health condition Smith allegedly suffered from at the relevant time.  The only medical documents in the record are the two FMLA certification forms that Smith returned to Sandine. ECF No. 43-10; 43-11.  Those documents provide no insight into the condition for which Smith was seeking treatment; they do not detail any symptoms of the condition, how the condition limited Smith's ability to perform his work, or why the condition would endure for the described period.

Though there are numerous references to Smith's need to see a specialist, there is no description of what kind of specialist he would see or for what purpose. The only detail provided is in the second certificate in which the "State the nature of the treatments" prompt is answered with "Behavioral Health", with no further elaboration or explanation. ECF No. 43-11, p. 3.

That single detail leads nowhere because Smith never referenced any mental or behavioral issues when questioned about his need for FMLA leave in his deposition. ECF No. 40-1, p. 36-45. Instead, Smith testified to a patchwork of vague and varying explanations as to why he needed FMLA leave. These explanations include alleged issues with his neck and thyroid, though it is unclear if they are separate issues, the same issue, or what the specific condition he is describing could be. Smith also mentions his need for a colonoscopy, an issue with his uvula, and broadly asserts that he could not remember why Richarson said he needed time off work because "I had a lot of health issues going on." *Id*. at p. 43. The only specific condition Smith cites is a procedure to remove his uvula, but he also admits it was an outpatient procedure that only required two days of recovery. *Id*. at p. 40-41. Smith gives no argument or evidence as to how the uvula procedure could be viewed as a serious health condition under either 29 C.F.R. § 825.114 or § 825.115. Indeed, Smith never engages with the regulatory definitions of "serious health condition" or attempts to fit any of his vaguely alleged conditions into those definitions. Amidst his revolving explanations, Smith never articulates any other specific condition he had or any diagnosis he received. Smith also offers only vague testimony to imply that any condition could have been serious enough or incapacitated him to a degree that would qualify him for FMLA leave.[10] There is also no medical evidence in the record corroborating any of Smith's vague testimony.

---

[10] The closest Smith comes to describing any incapacity is stating that "Well, I had a big, big ball and knot right here on my neck, and it had me down. I couldn't even hardly walk. That's -- I went to the doctor for that, and that's when she gave me the FMLA paper." ECF No. 40-1, p. 40.

Though Smith attempts to bolster his allegations with a sworn declaration in response to the instant motion, it provides no more clarity as to what specific condition he suffered from and it attempts to add mental health issues as a condition qualifying him for FMLA leave. ECF No. 48-2. The declaration offers more vague assertions such as "I was dealing with worsening (and still harmful) mental health issues", "I was under stress, full of anxiety, unable to concentrate, and just not myself mentally or emotionally", and "I was having severe thyroid problems." *Id.* at p. 4. Also, Smith's new assertion that FMLA leave was primarily aimed at addressing mental health issues contradicts his deposition testimony in which he never identified any mental health problems as a reason for requesting FMLA leave. Such contradictory assertions cannot be a shield against summary judgment. *See Prosser v. Ross*, 70 F.3d 1005, 1008 (8th Cir. 1995) (stating that "a party cannot avoid summary judgment by contradicting his own earlier testimony."). Moreover, like his other alleged medical problems, these assertions of mental health issues are not supported by any medical documentation in the record or testimony from a health care provider. This record is simply too bare to create a genuine question of fact as to whether Smith had a serious health condition that entitled him to FMLA leave. Without demonstrating that he had such a health condition, Smith cannot prevail on his interference claim. [11] *Wheeling Mach. Prod.*, 779 F.3d at 519.

---

[11] The Court does find that if Smith could establish that he was entitled to FMLA leave and suffered damages, the evidence in the record is sufficient to show that Warren interfered with his rights under the FMLA. Warren was entitled to require that Smith have a healthcare provider fill out an FMLA certification form to support his entitlement to FMLA leave. *See* 29 C.F.R. § 825.305(a). However, when Warren, through Sandine, informed Smith that the FMLA certificates he returned were insufficient and incomplete, it was required to inform Smith in writing what was necessary for him to provide an acceptable certificate. *See* 29 C.F.R. § 825.305(c) ("The employer shall advise an employee whenever the employer finds a certification incomplete or insufficient, and shall state in writing what additional information is necessary to make the certification complete and sufficient."). Sandine testified that she never provided Smith with written instructions on how to satisfactorily complete the certification forms. ECF No. 48-3, p. 56. If Smith was entitled to FMLA leave, this failure to provide written directives would establish Warren's interference with his rights under the FMLA. *See* 29 C.F.R. § 825.220(b) ("Any violations of the [FMLA] or of these regulations constitute interfering with, restraining, or denying the exercise of rights provided by the [FMLA].").

The Court also notes that Smith has presented no evidence of damages incurred because of any interference with FMLA rights. The alleged damages in Smith's Amended Complaint do not delineate which damages are attributable to the FMLA claim, but he broadly asserts that he has suffered "negative effects to his mental and physical health, loss of work opportunity, stress, emotional anguish, and other harms." ECF No. 21, p. 5. The mental and emotional damages alleged are not recoverable for an FMLA claim. *See Rodgers*, 435 F.3d at 908-09. Also, Smith has not provided any evidence of the value of any monetary loss from Warren's alleged FMLA interference, such as his lost wages or the value of any employment benefits lost as a result. *See id*; *see also* 29 U.S.C. § 2617(a)(1)(A); 29 C.F.R. § 825.220(b); 29 C.F.R. § 825.400(c). The inability of Smith to demonstrate any damages resulting from Warren's alleged interference with his FMLA rights similarly results in his interference claim failing. *See Browning v. Bay Radiology Assoc. PL*, 2024 WL 3200472, at *1-3 (11th Cir. 2024) (affirming a district court's grant of summary to a defendant for an FMLA claim because the plaintiff failed to present evidence of damages). Accordingly, the Court must enter summary judgment in favor of Warren as to Smith's FMLA claim.

## IV. CONCLUSION

For the reasons stated above, the Court finds that Defendant Warren's Motion for Summary Judgment (ECF No. 38) should be and is hereby **GRANTED**. Plaintiff's claims are hereby **DISMISSED WITH PREJUDICE**. A judgment of even date shall issue.

**IT IS SO ORDERED**, this 3rd day of March, 2025.

/s/ Susan O. Hickey
Susan O. Hickey
Chief United States District Judge